Indira J. Cameron-Banks (Cal. Bar No. 248634)
  *Indira@CameronJones.law*
Terrence M. Jones (Cal. Bar No. 256603)
  *Terrence@CameronJones.law*
C A M E R O N | J O N E S L L P
  8383 Wilshire Boulevard, Suite 800
  Beverly Hills, California 90211
  (424) 757-0585 | www.CameronJones.law

Attorneys for Plaintiff KAREN DRAPER

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREN DRAPER, an individual,<br><br>          Plaintiff,<br><br>     v.<br><br>TESLA, INC., a Delaware corporation doing business in California as "TESLA MOTORS, INC.," and DOES 1-10, inclusive,<br><br>          Defendants. | Case No. CV23-2197<br><br>**COMPLAINT FOR DAMAGES**<br><br>**First Cause of Action**<br>Retaliation<br>(Cal. Gov. Code § 12490(h))<br><br>**Second Cause of Action**<br>Retaliation<br>(Cal. Labor Code § 1102.5(b))<br><br>**Third Cause of Action**<br>Racial Discrimination<br>(Cal. Gov. Code § 12490(a),(h))<br><br>**Fourth Cause of Action**<br>Wrongful Termination in Violation of Public Policy<br><br>**Fifth Cause of Action**<br>Failure to Prevent Discrimination<br>(Cal. Gov. Code § 12940(k))<br><br>**Demand for Jury Trial** |

COMES NOW Plaintiff Karen Draper ("Plaintiff" or "Draper"), who brings this Complaint for Damages and Demand for Jury Trial ("Complaint"), rested upon this Court's diversity jurisdiction, against Tesla, Inc., a Delaware corporation doing business in California as "Tesla Motors, Inc." and having its principal place of business in Texas, and Does 1-10, inclusive (collectively, "Defendant"), alleging, based upon information and belief, the following with respect to Defendant's identities and conduct:

## I.

## NATURE OF THE CASE

1.      This is a wrongful termination action brought pursuant to California's Fair Employment and Housing Act (Cal. Gov. Code § 12940 et seq.) ("FEHA") in which Plaintiff Karen Draper alleges, generally, that she was fired in retaliation for voicing concerns and complaints about her former employer's desire to terminate another employee, without just cause, who was on a company-approved leave of absence protected by the Family and Medical Leave Act (29 U.S.C. § 2601 et seq.) ("FMLA").

2.      As alleged in further detail below, Draper worked as a Human Resources ("HR") manager for the auto production unit of Tesla, Inc. ("Tesla" or the "Company").  In or about September 2022, a Tesla production supervisor named Bianca Maradiaga submitted the appropriate medical documentation and internal paperwork to take an FMLA-protected leave of absence, which was approved.

3.      Despite the medical necessity and Maradiaga's compliance with Tesla's internal policies and procedures for taking such leave, her absence engendered in Maradiaga's manager—Kristopher Lindsey—retaliatory animus toward her and a stated desire to fire Maradiaga while she was out.

1

4.      Lindsey conveyed his desire and requests to fire Maradiaga openly and repeatedly—in emails to HR and other operational managers, during face-to-face meetings with HR and other operational managers, and with clear disdain for Maradiaga during team meetings with his direct-reports and Maradiaga's peers and coworkers that she "was not welcome back."

5.      Lindsey was personally and irrationally fixated on getting Maradiaga terminated despite the fact that she had done nothing wrong other than to exercise her statutory rights to take protected medical leave.  Maradiaga did not have any significant documented performance deficiencies; Lindsey was able to back-fill Maradiaga's position during her leave such that her absence did not adversely impact Tesla's manufacturing operation; and Maradiaga had been compliant while on leave with her obligations to submit appropriate medical documentation and internal leave forms timely and upon request.

6.      Still, Lindsey was rabid about getting Maradiaga terminated.  Lindsey began lashing out at the HR representatives that attempted to calm him down and explain that it was illegal, and would likely subject Tesla to liability, if they executed his request to terminate Maradiaga without cause while she was on protected leave.

7.      On at least three separate occasions, Draper sent her direct-reports to personally discuss with Lindsey his requests to terminate Maradiaga and to explain to him that there was no legal or practical basis to do so.  Yet, in each instance, Draper's direct-reports returned from their respective interactions with Lindsey complaining of his loud, aggressive, and maniacal behavior toward them when discussing Maradiaga, as Lindsey continued to press each of them to execute on his groundless requests to terminate her.  It was plain to each of Draper's direct-reports that Lindsey had some kind of personal vendetta against Maradiaga that was clouding his judgment.  Moreover, whatever vengeful crusade Lindsey was

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL

mounting was causing him to lash out at HR and operational representatives in a rude, abrasive, and unprofessional manner.

8.   They each reported back to Draper after their respective meetings with Lindsey that he had yelled at, belittled, and disrespected them, and that they were uncomfortable having further interactions with Lindsey going forward.

9.   Consequently, on December 9, 2022, Draper held her own meeting with Lindsey to try herself to explain to him that terminating Maradiaga while on protected leave and without cause was illegal and would likely subject Tesla to liability.  Yet, just as in previous instances, Lindsey was loud, rude, rabid, and intransigent with Draper during their meeting about his position that Maradiaga could and should be fired while out on FMLA leave.

10.   Following her meeting with Lindsey, which was attended by two other HR representatives and an operational manager, Draper immediately reported his behavior to her immediate supervisor, Nicole Burgers, the head of HR.

11.   Yet, Burgers did not react the way in which Draper anticipated. Instead of validating Draper's admonishment to Lindsey that it would be illegal to fire an employee on protected leave for no reason, and instead of validating Draper's description of Draper's own firsthand experience with Lindsey's aggressive obsession with terminating Maradiaga, Burgers turned on Draper and opened an investigation against Draper for not capitulating to a production manager's demands.

12.   Draper's refusal to capitulate to Lindsey's demands engendered retaliatory animus in Burgers, as well as in Burger's managers, toward Draper. Lindsey was a production manager for one of Tesla's highest volume vehicles, its "Model Y."  Thus, there was a significant amount of institutional pressure to keep Model Y production on course, which meant keeping Model Y production managers, like Lindsey, happy.  The Model Y production managers wielded a lot of institutional power within the Company and frequently held face-to-face

meetings with Tesla's CEO, Elon Musk.  Musk frequently traveled to Tesla's Fremont production facility to walk the Model Y manufacturing line and interact directly with production floor employees and production managers, like Lindsey.

13.     The hostility toward Draper was also rooted in race-based animus and bias against Draper as a Black woman.  Despite witness statements to the contrary, Draper's managers characterized her interactions with Lindsey as the product of being an "Angry Black Woman," a racial trope that stereotypes Black women as inherently short-tempered, ill-mannered, and over-bearing.  Draper's managers accused her of being "aggressive" and "out-of-control" with Lindsey—a Caucasian male—while merely describing him as "passionate" and "animated," a race-based disparity that Draper was quick to confront them about.

14.     Thus, Draper's refusal to acquiesce in Lindsey's illegal crusade to fire Maradiaga engendered in Burgers and her managers retaliatory animus toward Draper insofar as they believed that they could be held responsible for not fostering an environment that coddled and appeased Model Y production managers, like Lindsey.

15.     So, Burgers and her managers fired Draper instead.  On February 10, 2023—in just over 60 days' time following Draper's face-to-face meeting with Lindsey and refusal to terminate Maradiaga—Burgers called Draper into a meeting with Burgers' Texas counterparts and terminated Draper's employment.

16.     Burgers and her Texas counterparts offered Draper no explanation for the basis of her termination other than it was for unspecified "performance issues." But that, of course, was pretext.  The real reason that Draper was fired was because she refused to execute Lindsey's, Burgers', and others' requests to fire Maradiaga while she was on a protected FMLA leave.

17.     And to be sure, Draper did not have any "performance issues."  At no point during Draper's Tesla employment, and certainly not during the intervening period between her subject interaction with Lindsey and her termination, did she

have any "performance issues."  She had glowing performance reviews.  She had never been issued any corrective actions.  She had never been informally chastised for insubordination or dereliction of her duties.  She did not have any attendance or tardiness problems.  To the contrary, Draper excelled in her position from the moment she was hired.  In fact, in June 2022, just six months before her final meeting with Lindsey, Draper was even personally promoted by Tesla CEO Elon musk.

18.     The proffered basis for Draper's termination was pretextual.  The decision to fire Draper, as validated by Tesla's executive management and managing agents was not truly the result of "performance issues," but was instead rooted in retaliatory and race-based animus as a direct consequence of Draper's refusal to engage in what she reasonably believed in good faith to be an illegal act on Tesla's behalf—that is, to execute the termination of Maradiaga, without just cause, while she was on protected FMLA leave.

19.     Accordingly, this lawsuit seeks to redress the financial and emotional harm Draper suffered, and continues to suffer, as a result of the discrimination and retaliation she endured while employed with Tesla, as well as on account of her wrongful termination.

## II.

## JURISDICTION, VENUE & DIVISIONAL ASSIGNMENT

20.     This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  As set forth below, Plaintiff is diverse from all Defendants in this litigation and the amount in controversy exceeds seventy-five thousand dollars ($75,000).

21.     The Court has personal jurisdiction over Defendant in that Tesla is registered to do business and, in fact, does do substantial business within the State of California and within the Northern District of California.

22.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the acts or omissions giving rise to Plaintiff's claims occurred within this judicial district, namely, within Alameda County.

23.     Prior to the initiation of this action before this Court, Plaintiff properly exhausted their administrative remedies as required under FEHA by filing a complaint against Defendant with the California Department of Civil Rights ("DCR") alleging, inter alia, the claims asserted herein.  DCR issued Plaintiff a "right-to-sue" letter on May 5, 2023.  Accordingly, Plaintiff has fulfilled all preconditions to the filing of this FEHA-based suit.  (Collectively attached hereto as Exhibit A are true and correct copies of Plaintiff's administrative complaint and right-to-sue letter.)

24.     Assignment to this Division is proper, consistent with Civil L.R. 3-2(c), in that a substantial part of the acts or omissions giving rise to Plaintiff's claims occurred within Alameda County.

## III.
## PARTIES & RELEVANT NON-PARTIES

25.     Plaintiff Karen Draper is an individual who, at all times material to the allegations of this Complaint, was domiciled in California, residing here with the intention of permanently residing in this state.  At all times material to the allegations of this Complaint, Draper was a resident of Oakland, California, within Alameda County, which is situated within this judicial district.

26.     Defendant Tesla, Inc., doing business as "Tesla Motors, Inc.," is, as Plaintiff is informed and believes, and on that basis alleges, a corporation organized under the laws of the State of Delaware which, at all times material to the allegations of this Complaint, had its principal place in Austin, Texas and was registered by the California Secretary of State to do business in California.

Plaintiff is further informed and believes, and on that basis alleges, that Tesla is a business entity which, generally, operates as a manufacturer of electric motor vehicles.

27.     Plaintiff is further informed and believes, and on that basis alleges, that at all times mentioned herein and otherwise relevant to the allegations of this Complaint, FEHA was in full force and effect, and binding on Tesla, as the Company regularly employed more than five persons within the State of California thereby bringing Tesla within the provisions of FEHA's statutory scheme.

28.     Plaintiff is ignorant of the true names and capacities of the defendants sued as DOES 1 through 10, inclusive (the "DOE Defendants") and, therefore, sues these DOE Defendants by such fictitious names.  Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

29.     Plaintiff is informed and believes, and on that basis alleges, that the DOE Defendants acted wrongfully, maliciously, intentionally, and negligently; that each is responsible in some manner for the events and happenings complained of herein; and that Plaintiff's injuries, as alleged herein, were proximately caused by the DOE Defendants, either through each Defendant's own conduct or through the conduct of their agents and/or employees.

30.     Plaintiff is informed and believes, and on that basis alleges, that at all times material to the allegations of this Complaint, each of the Defendants, whether named or fictitiously named as a DOE Defendant, were the merging entity, merged entity, subsidiary, acquiring corporation, agent and/or employee of each of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the course and scope of such agency and/or employment with knowledge, advice, permission and consent of each other.

31.     As used herein, the term "Defendants" means all Defendants, both jointly and severally, and references by name to any one Defendant shall include

and reference all Defendants, both individual, corporate, and business entities, both specifically named and unnamed, and both jointly and severally to all.

32.     Plaintiff is further informed and believes, and on that basis allege, that at all times material to the allegations of this Complaint, Defendants caused, aided, abetted, facilitated, encouraged, authorized, permitted and/or ratified the wrongful acts and omissions described in this Complaint.

### IV.
### FACTUAL ALLEGATIONS

**A.    Draper Excelled in Her Employment with Tesla and Was Even Singled Out for Promotion by CEO Elon Musk**

33.     Plaintiff incorporates by reference paragraphs 1 through 32, above, and repeats, reiterates, and realleges each and every allegation contained therein with the same force and effect as if such paragraphs were set forth fully at length here.

34.     Plaintiff Karen Draper is a 47-year-old Black female.  Draper received her undergraduate degree from UCLA.  Draper has spent the majority of her professional career working in the Human Resources field, having worked in high-level HR positions for the past 17 years.  Draper has worked for a number of Fortune 500 companies and excelled in each position she has held.

35.     On or about February 28, 2022, Draper began working for Tesla as a "Senior Human Resources Business Partner."  Such was an HR management position for which Draper was generally responsible for managing approximately five subordinate HR representatives in the provision of HR-related services to auto production employees.  Specifically, Draper was assigned to oversee the provision of HR-related services to production employees for Tesla's Model Y vehicle at the Company's manufacturing plant in Fremont, California.

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL

36.     At all times material to the allegations of this Complaint, Draper's physical duty station was located within Tesla's Fremont facilities.  The Fremont location was the corporate duty station for approximately 50 HR professionals.  In additional to the Model Y, the Fremont plant also produced vehicles from Tesla's Model S, Model 3, and Model X lines.

37.     At all times material to the allegations of this Complaint, Draper's direct supervisor at the Fremont facility was a woman named Nicole Burgers, the overall HR Manager for Tesla's Fremont facility.  Burgers had the authority to, and did, control Draper's day-to-day tasks and functioning as one of Burgers' direct-reports.  Burgers dictated Draper's daily execution of her managerial role, endorsed her decisions, overruled her decisions, and provided her counsel and advice with respect to issues that come up at the Fremont location.

38.     At all times material to the allegations of this Complaint, Burgers was a managing agent within Tesla's corporate hierarchical structure.  As HR Manager, Burgers was a high-level Tesla manager and directly responsible for overseeing Tesla's entire HR operation at its Fremont facility.  In that role, Burgers exercised substantial discretionary authority over decisions that ultimately determined Tesla's HR and organizational policy.  Burgers conceived of and implemented Company HR policies and practices, determined HR-related budgets, and hired and fired both HR and Production staff.  Burgers had the authority and discretion to dictate and implement corporate policies and standards for the recruitment, hiring, and training of HR and Production staff, from associate to management-level employees; she had the authority and discretion to dictate and implement recruitment campaigns specifically-targeted to the demographics of her region's employee base; and she had the authority and discretion to dictate and implement formal policies and informal practices at the overall Fremont facility with respect to responding to employees' complaints of workplace discrimination, harassment,

and other complaints of perceived violations of the law and breaches of Company rules and policy.

39.     Plaintiff understood and perceived Burgers to be a Black female.

40.     At all times material to the allegations of this Complaint Draper's second-line manager was Bert Somsin, who physically worked out of Tesla's corporate headquarters in Austin, Texas.  Despite the geographical distance, Somsin had the authority to, and did, control Draper's day-to-day tasks and functioning as one of Somsin's direct-reports.  Somsin dictated Draper's daily execution of her managerial role, endorsed her decisions, overruled her decisions, and provided her counsel and advice with respect to issues that come up at the Fremont location.

41.     At all times material to the allegations of this Complaint, Somsin was a managing agent within Tesla's corporate hierarchical structure.  As a Senior HR Director, Somsin was a high-level Tesla manager and directly responsible for overseeing Tesla's HR operations at several of its manufacturing facilities, including the Fremont plant.  In that role, Somsin exercised substantial discretionary authority over decisions that ultimately determined Tesla's HR and organizational policy.  Somsin conceived of and implemented Company HR policies and practices, determined HR-related budgets, and hired and fired both HR and Production staff.  Somsin had the authority and discretion to dictate and implement corporate policies and standards for the recruitment, hiring, and training of HR and Production staff, from associate to management-level employees; she had the authority and discretion to dictate and implement recruitment campaigns specifically-targeted to the demographics of her region's employee base; and she had the authority and discretion to dictate and implement formal policies and informal practices at the overall Fremont plant with respect to responding to employees' complaints of workplace discrimination, harassment, and other

complaints of perceived violations of the law and breaches of Company rules and policy.

42.     Plaintiff understood and perceived Somsin to be an Asian male.

43.     Both prior to Draper's arrival at the Fremont facility as well as during her tenure with the Company, there were significant issues at the Fremont facility, particularly stemming from the Model Y plant.  Since its introduction in 2020, the Model Y has become Tesla's top-selling vehicle line and, by all estimates, one of the top-selling electric vehicles in the world.  Thus, there was, and remains, constant pressure to keep the Model Y's sales trajectory high.  Perhaps as a consequence of this desire to produce Model Ys at such breakneck pace, the Company has failed to cultivate a healthy working environment at the Fremont facility.  Both before and during Draper's time there, there were frequent complaints of racism, sexism, and cronyism.

44.     For instance, one Tesla Fremont employee sued the Company after regularly hearing racial slurs on the factory, including the N-word, and seeing racist graffiti in the bathrooms.  A federal jury awarded him a multi-million dollar verdict in 2021.

45.     As well, in 2022, California's Civil Rights Department (known then as the Department of Fair Employment and Housing) filed suit against Tesla for injunctive and monetary relief given the volume of "complaints by Black and/or African American workers about racial harassment, racial discrimination, and retaliation lodged over a span of almost a decade[, which] have been futile."  According to the State's suit, Tesla turned "a blind eye to years of complaints from Black workers who protest the commonplace use of racial slurs on the assembly line" and that the Company continues to be "slow to clean up racist graffiti with swastikas and other hate symbols scrawled in common areas."

46.     Unsurprisingly, there was a remarkably high turnover rate for line employees, supervisory-level, and upper management employees alike at the Fremont facility, and even amongst the HR staff.

47.     Consequently, Elon Musk, the co-founder and CEO of Tesla, frequently visited the Fremont facility and walked the floor of the Model Y production line in particular.  Musk leads all product design, engineering and global manufacturing of the company's electric vehicles, battery products and solar energy products.  At all times material to the allegations of this Complaint, Musk frequently sat down for face-to-face meetings with Model Y employees, of all levels and degrees of authority, to directly discuss a myriad of issues, including manufacturing efficiencies and production problems, Company culture and work environment, and the recruitment and retention of employees.

48.     Draper was part of one such face-to-face meeting with Musk on or about June 9, 2022.  Among the topics of discussion during this particular meeting was the high turnover rate for HR professionals at the Fremont facility that were dedicated to the auto production employees.  A portion of the discussion centered on the notion that one of the reasons why the production employee turnover rate was so high, in general, was a consequence of the high turnover rate among production-dedicated HR staff.

49.     Among the outcomes of the participants' discussion with Musk was his decision to promote Draper to an "HR for HR" role that had theretofore been assigned to an HR manager in Texas.  Musk was impressed by Draper's insight and contributions and, so, promoted her on the spot.  Musk moved Draper up to a manager position that would be inward-facing; that is, Draper would also be principally responsible for providing HR services to the HR professionals assigned to the Fremont facility.  Musk believed that Draper was better suited to take on the role given her talent and poise, and given the impracticality and inefficiency of the role being performed by a Texas-based manager.

50.     Musk asked Draper to compile her notes about his decisions during the meeting as well as the participants' discussions and email them to him so that they would be memorialized in writing.   Draper did so that same evening. Attached hereto as <u>Exhibit B</u> are true and correct copies of Draper's emails to Musk memorializing, among other things, his decision to promote Draper and her subsequent communications with Musk about the status of the changes he ordered implemented.  The on-the-spot promotion by the co-founder and CEO of the Company embodied the superior performance that Draper provided to Tesla during the entirety of her employment there.  And, to be sure, there was no decline in Draper's performance in the ensuing eight months between her promotion by Musk in June 2022 and her termination in February 2023.

51.     Draper continued to excel in her HR role from that point on.  She never received any corrective actions.  She was never written up.  She was never formally or informally disciplined.  She never had any attendance issues.  She received remarkably positive feedback from her subordinate direct-reports with respect to her supervision, guidance, and leadership.  She received positive performance reviews and feedback from both her local manager, Nicole Burgers, as well as her Texas-based second-line supervisors.

52.     That all changed when Draper defied a Model Y production manager's directive to fire an employee, without cause, who was on a FMLA-protected and approved medical leave.

**B.      Draper was Terminated in Retaliation for Refusing to Carry Out a Production Manager's Desire to Fire an Employee on Protected Medical Leave**

53.     In or about September 2022, a Model Y production supervisor named Bianca Maradiaga submitted the appropriate medical documentation and internal paperwork to take an FMLA-protected leave of absence, which was processed and approved.  Maradiaga's approved medical leave shrouded her with the protections

of the FMLA statutory scheme, namely, the right not to suffer any adverse employment action as a consequence of her medical absence.

54.     Yet, despite the medical necessity and Maradiaga's compliance with Tesla's internal policies and procedures for taking such leave, her absence engendered in Maradiaga's manager—Kristopher Lindsey—retaliatory animus toward her and a stated desire to fire Maradiaga while she was out.

55.     Plaintiff understood and perceived Lindsey to be a Caucasian male.

56.     Lindsey did not believe that Maradiaga was genuinely ill or hurt.  And he already disliked Maradiaga because of her Latina ethnicity and female gender. Consequently, on or about November 7, 2022, Lindsey began a crusade to get Maradiaga fired, without legal cause, while she was in a protected leave status.

57.     Beginning on or about November 7, 2022, and continuing until the date of Draper's termination on February 10, 2023, Lindsey conveyed his desire and requests to fire Maradiaga openly and repeatedly—in emails to HR and other operational managers, during face-to-face meetings with HR and other operational managers, and with clear disdain toward Maradiaga during team meetings with his direct-reports and Maradiaga's peers and coworkers.

58.     Lindsey was personally and irrationally fixated on getting Maradiaga terminated despite the fact that she had done nothing wrong other than to exercise her statutory rights to take protected medical leave.  Maradiaga did not have any significant documented performance deficiencies; Lindsey was able to back-fill Maradiaga's position during her leave such that her absence did not adversely impact Tesla's manufacturing operation; and Maradiaga had been compliant while on leave with her obligations to submit appropriate medical documentation and internal leave forms timely and upon request.

59.     On at least three separate occasions, Draper sent her direct-reports to personally discuss with Lindsey his requests to terminate Maradiaga and to explain to him that there was no legal or practical basis to do so.  Yet, in each instance,

Draper's direct-reports returned from their respective interactions with Lindsey complaining of his loud, aggressive, and maniacal behavior toward them when discussing Maradiaga, as Lindsey continued to press each of them to execute on his groundless requests to terminate her.  It was plain to each of Draper's direct-reports that Lindsey had some kind of personal vendetta against Maradiaga that was clouding his judgment.  Moreover, whatever vengeful crusade Lindsey was mounting was causing him to lash out at HR and operational representatives in a rude, abrasive, and unprofessional manner.

60.     They each reported back to Draper after their respective meetings with Lindsey that he had yelled at, belittled, and disrespected them, and that they were uncomfortable having further interactions with Lindsey going forward.

61.     For instance, on or about November 15, 2022, in discussing his unfulfilled request to terminate Maradiaga's employment, Lindsey was intentionally curt and abrasive with Amandeep Singh, one of Draper's direct-reports.  Singh advised Lindsey that his request was being evaluated and that he would provide an update once available, but that did not seem to satisfy Lindsey.

62.     On or about November 22, 2022, in discussing his unfulfilled request to terminate Maradiaga's employment with another of Draper's direct-reports, Jessica Jones, Jones likewise tried to explain to Lindsey that she could not terminate Maradiaga's employment while on a protected medical absence and that they needed to respect her FMLA leave.  Still, days later on November 28, Lindsey emailed Jones and stated that she had confirmed with him she would execute Maradiaga's termination, which was untrue.

63.     On or about November 29, 2022, in discussing his unfulfilled request to terminate Maradiaga's employment with Jones once more, Jones again explained to Lindsey that Maradiaga could not be terminated, without cause, while on protected leave.  In response, Lindsey became angry and raised his voice, stating that Maradiaga "was not welcome back."  Jones reported the encounter to

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL

Draper, explaining that Lindsey appeared to be taking the situation personally and that she was uncomfortable being around him.

64. Consequently, on December 9, 2022, Draper held her own meeting with Lindsey to try herself to explain to him that terminating Maradiaga while on protected leave and without cause was illegal and would likely subject Tesla to liability. Yet, just as in previous instances, Lindsey was loud, rude, rabid, and intransigent with Draper during their meeting about his position that Maradiaga could and should be directed while out on FMLA leave.

65. Two of Draper's direct-reports, Sophia Favela and AnJane Claytor, attended the meeting with Lindsey, and they were also joined by an operational manager named Napoleon Reyes. According to Favela:

> Karen [Draper] started the meeting and spoke about the case and the concerns Kristopher's behavior had brought up. Kristopher's demeanor changed as the chat continued. He became more abrasive, his volume increased to a noticeable extent, not enough to be yelling, but enough to be noteworthy especially as he grew visibly upset when Karen said that he was "Obsessed" with Bianca Maradiaga's case.

66. According to Favela, Lindsey's "neck was visibly red" with anger when he spoke about Maradiaga throughout the meeting, as it was clear that Lindsey "seemed to have taken Bianca's leave and lack of return personally." As he had in other discussions about Maradiaga, Lindsey reiterated "how he no longer wanted her to work at [Tesla]." "After the meeting [Lindsey] stormed off out of the conference room and building . . . ."

67. On or about that same day following the meeting with Lindsey, Draper reported his behavior to her immediate supervisor, Burgers.

68. Yet, Burgers did not react in the way in which Draper anticipated. Instead of validating Draper's admonishment to Lindsey that it would be illegal to fire an employee on protected leave for no reason, and instead of validating

Draper's description of Draper's own firsthand experience with Lindsey's aggressive obsession with terminating Maradiaga, Burgers turned on Draper for not catering and capitulating to the demands of a production manager's demands—particularly those of a manager from Tesla's top-selling Model Y vehicle line.

69.     Draper's refusal to capitulate to Lindsey's demands engendered retaliatory animus in Burgers, as well as in Burger's Texas-based counterpart, Somsin, toward Draper.  As explained above, Lindsey was a production manager for one of Tesla's highest volume vehicles, its Model Y.  Thus, there was a significant amount of institutional pressure to keep Model Y production on course, which meant keeping Model Y production managers, like Lindsey, happy.  The Model Y production managers wielded a lot of institutional power within the Company and frequently held face-to-face meetings with Musk.  Musk frequently traveled to the Tesla's Fremont production facility to walk the Model Y manufacturing line and interact directly with production floor employees and production managers, like Lindsey.

70.     Thus, Draper's refusal to acquiesce in Lindsey's illegal crusade to fire Maradiaga engendered in Burgers and Somsin retaliatory animus toward Draper insofar as they believed that they could be held responsible for not fostering an environment that coddled and appeased Model Y production managers, like Lindsey.

71.     Consequently, in or about December 2023, following the readout she received from Draper about her meeting with Lindsey and refusal to execute his request to fire Maradiaga, Burgers opened a misconduct investigation into Draper's behavior rather than Lindsey's.

72.     The investigation was groundless and pretextual.  Burgers and Somsin commenced the investigation against Draper in retaliation for defying Lindsey. Draper had done nothing wrong other than to comply with her understanding of the law and explain the same to Lindsey.

73.    At all times material to the allegations of this Complaint, Draper maintained a good faith belief that it was a violation of state and federal law to fire an employee—namely, Maradiaga—while such employee was on a properly requested and granted FMLA leave.  At all times material to the allegations of this Complaint, Draper reasonably believed that terminating Maradiaga's employment under these circumstances—without any just cause other than the mere fact that Lindsey just did not like the fact that she was absent—was a violation of the provisions of the FMLA, California's FEHA, and other statutory laws protective of employees on medical leave.

74.    Among other things, Burgers accused Draper of being an "angry Black Woman" during her meeting and interaction with Lindsey, a racial trope that stereotypes Black women as inherently short-tempered, ill-mannered, stubborn, and over-bearing.  Draper was insulted by the accusation, which was both false as a general matter and with specific regard to her discussion with Lindsey.

75.    Draper learned that Burgers had questioned several of Draper's direct-reports during the course of her investigation, none of whom validated Burgers' accusation that Draper had been aggressive or unprofessional to any degree with Lindsey.  To the contrary, Draper's direct-reports corroborated Draper's account that it was Lindsey that became red-necked and rude, just as he had during their own preceding interactions with him.

76.    Draper obtained written statements from her direct-reports about Lindsey's behavior toward them as well as Draper's December 9 meeting with him.  According to Sophia Favela:

> During this meeting, Kristopher stated that Karen was upset since she was raising her voice, Karen made it clear she was not upset by this meeting. That it was her responsibility as an agent of this business to protect managers like Kristopher from causing us a lawsuit since behavior like the one he has been exhibiting could lead to legal trouble. He seemed dismissive

about the seriousness and HR's intent for this meeting, he was agitated. He expressed his frustration with administration, stating that he felt like he had not gotten much support from HR. He expressed his frustration with the LOA process. After the meeting he stormed off out of the conference room and building inside GA4.

77.    Draper also obtained statements from AnJane Claytor and Amandeep Singh which, unless intentionally destroyed by the Company, remain in Tesla's possession.  Attached hereto as <u>Exhibit C</u> are true and correct copies of Favela's and Jones' statements about Lindsey's behavior.

78.    Still, Burgers continued to push the false narrative that Draper was the aggressor and had acted unprofessionally.  Burgers continued to characterize Draper utilizing the "Angry Black Woman" racial trope, all the while carefully choosing her words to describe Lindsey as merely "passionate" and "animated." When Draper confronted Burger about the race-based disparity, Burgers accused Draper of "playing the race card" and rationalized that, since Draper had knowledge of Lindsey's "volatility," Draper should have been more careful to soothe his temper.  Draper voiced her disagreement with that assessment and biased overprotection of Lindsey's White male fragility.

79.    The fact that Draper defied Lindsey and challenged Burgers and Somsin culminated in her firing just 63 days later.

80.    On February 10, 2023, Burgers summoned Draper to a meeting and advised that Burgers' counterparts in Texas would be participating by video-call. As soon as the meeting began, Burgers advised Draper that her Tesla employment was being terminated, effective immediately.  Draper received no explanation for the basis of her termination other than it was for unspecified "performance issues."

81.    But that reasoning, of course, was pretext.  The real reason that Draper was fired was because she refused to execute Lindsey's, Burgers', and others' request to fire Maradiaga while she was on a protected FMLA leave.

82.   And to be sure, Draper did not have any "performance issues."  At no point during Draper's Tesla employment, and certainly not during the intervening period between her subject interaction with Lindsey and her termination, did she have any for performance issues.  She had glowing performance reviews.  She had never been issued any corrective actions.  She had never been informally chastised for insubordination or dereliction of her duties.  She did not have any attendance or tardiness problems.  To the contrary, Draper excelled in her position from the moment she was hired.  In fact, in June 2022, just six months before her final meeting with Lindsey, Draper was even personally promoted by Elon Musk.

83.   The proffered basis for Draper's termination was pretextual.  The decision to fire Draper, as validated by Tesla's executive management and managing agents was not truly the result of "performance issues," but was instead rooted in retaliatory animus based upon Draper's refusal to engage in what she believed in good faith to be an illegal act on Tesla's behalf—that is, to execute the termination of Maradiaga while she was on protected FMLA leave.  It was also a direct consequence of race-based animus and bias against Black women.

## V.
## CAUSES OF ACTION

### First Cause of Action

### Retaliation

### In Violation of Cal. Gov. Code § 12940(h)

### (Against All Defendants)

84.   Plaintiff incorporates by reference paragraphs 1 through 83, above, and repeats, reiterates, and realleges each and every allegation contained therein with the same force and effect as if such paragraphs were set forth fully at length here.

85.     Section 12940(h) of the California Government Code makes it unlawful for an employer to retaliate against an employee for "oppos[ing] practices forbidden under [FEHA's statutory scheme] or because the person has filed a complaint, testified, or assisted in any proceeding under [FEHA's statutory scheme]."

86.     As described in the preceding paragraphs of this Complaint, on multiple occasions, from in or about February 2022, and continuing until in or about February 2023, Plaintiff engaged in such protected conduct under FEHA by complaining to and about Defendant's conduct.  In particular, Plaintiff's protected activity included, but is not limited to that which was described in the preceding paragraphs of this Complaint (see, supra, at Sect. IV):  voicing concerns, objections, and complaints about the harassment and intimidation of employees on protected medical leave, namely, but not limited to, Bianca Maradiaga; voicing concerns, objections, and complaints about the wrongful termination of employees on protected medical leave, namely, but not limited to, Bianca Maradiaga; voicing concerns, objections, and complaints about the harassment and intimidation of employees because of their race and ethnicity; and, voicing concerns, objections, and complaints about the harassment and intimidation of employees because of their gender.

87.     At all times material to the allegations of this Complaint in which Plaintiff engaged in such protected activities, Plaintiff maintained a good faith and reasonable belief that it was a violation of state and federal law for Defendant to engage in the conduct about which she voiced concerns, objections, and complaints.  In particular, Plaintiff maintained a good faith and reasonable belief that Defendant's conduct violated the provisions of the FMLA, California's FEHA, and other statutory laws protective of employees on medical leave, and prohibitive of harassment, discrimination, and retaliation based upon employees' protected characteristics such as race, ethnicity, and gender.

88.     On several occasions from in or about February 2022, and continuing until in or about February 2023, Plaintiff refused to participate in Defendant's illegal, discriminatory, retaliatory, immoral, and fraudulent activities, including without limitation, the harassment and intimidation of, retaliation against, and wrongful termination of employees on protected medical leave, and account of employees' protected characteristics such as race, ethnicity, and gender.

89.     In response, Defendant retaliated against Plaintiff, including, but not limited to, unreasonably and unjustifiably criticizing the quality of Plaintiff's work product and general job execution; publicly ridiculing and haranguing her job performance; and terminating Plaintiff's employment (as described in the preceding paragraphs of this Complaint.  (See, supra, at Sect. IV.)

90.     Plaintiff's protected activities, as set forth herein, were individually and collectively a substantial motivating reason in Defendant's decision to terminate Plaintiff's employment.

91.     The actions of Plaintiff's Tesla managers, as identified herein, as well as those of their agents and subordinates, negatively affected the terms, conditions, and privileges of Plaintiff's employment, ultimately resulting in Plaintiff's wrongful and illegal termination.

92.     Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, did not treat non-complaining, non-objecting, non-outspoken, non-Black, non-female-identifying employees in the same manner in which Plaintiff was treated; they were treated more favorably.  Thus, Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, personally singled Plaintiff out for disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and privileges of Plaintiff's employment, ultimately culminating in wrongful termination, because of Plaintiff's protected activities as described herein.

93.     Defendant's reasons for harassing Plaintiff and subsequently terminating Plaintiff's employment are pretextual in nature and calculated to disguise the motivating bases of the adverse employment actions to which Plaintiff was subjected.

94.     As a direct, foreseeable, and proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that Plaintiff has suffered, and will continue to suffer, actual, consequential, and incidental financial losses, including, without limitation, loss of income, salary and benefits, and the intangible loss of employment-related opportunities for growth in Plaintiff's field and damage to Plaintiff's professional reputation, humiliation, embarrassment, mental and emotional distress and discomfort all in an amount according to proof at the time of trial.

95.     Plaintiff is informed and believes, and on that basis alleges, that the aforesaid acts directed toward Plaintiff by Defendants were carried out with a conscious disregard of Plaintiff's right to be free from such illegal behavior, such as to constitute oppression, fraud, or malice pursuant to section 3294 of the California Civil Code, among other provisions, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendants.

96.     The actions alleged herein were taken by managing agents and/or officers of Defendant and/or ratified by managing agents and/or officers of Defendant, namely, Burgers and Somsin.  In so doing, said managing agents and/or officers of Defendant acted with oppression and malice as those terms are used in section 3294 of the California Civil Code.  As such, Plaintiff is entitled to an award of punitive damages.

97.     Plaintiff is also entitled to an award of attorneys' and experts' fees pursuant to, inter alia, section 12965(b) of the California Government Code.

## Second Cause of Action

### Retaliation

### In Violation of Cal. Labor Code § 1102.5(b)

### (Against the City of Los Angeles and Does 1-10)

98.    Plaintiff incorporates by reference paragraphs 1 through 97, above, and repeats, reiterates, and realleges each and every allegation contained therein with the same force and effect as if such paragraphs were set forth fully at length here.

99.    Section 1102.5(b) of the California Labor Code makes it unlawful for an employer to retaliate against an employee for "disclosing information . . . to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . of state or federal statute . . . or regulation, regardless of whether disclosing the information is part of the employee's job duties."

100.   As described in the preceding paragraphs of this Complaint, on multiple occasions, from in or about February 2022, and continuing until in or about February 2023, Plaintiff engaged in such protected conduct under section 1102.5 by complaining to and about Defendant's conduct.  In particular, Plaintiff's protected activity included, but is not limited to that which was described in the preceding paragraphs of this Complaint (see, supra, at Sect. IV):  voicing concerns, objections, and complaints about the harassment and intimidation of employees on protected medical leave, namely, but not limited to, Bianca Maradiaga; voicing concerns, objections, and complaints about the wrongful termination of employees on protected medical leave, namely, but not limited to, Bianca Maradiaga; voicing concerns, objections, and complaints about the harassment and intimidation of employees because of their race and ethnicity; and, voicing concerns, objections, and complaints about the harassment and intimidation of employees because of their gender.

101.   At all times material to the allegations of this Complaint in which Plaintiff engaged in such protected activities, Plaintiff maintained a good faith and reasonable belief that it was a violation of state and federal law for Defendant to engage in the conduct about which she voiced concerns, objections, and complaints.  In particular, Plaintiff maintained a good faith and reasonable belief that Defendant's conduct violated the provisions of the FMLA, California's FEHA, and other statutory laws protective of employees on medical leave, and prohibitive of harassment, discrimination, and retaliation based upon employees' protected characteristics such as race, ethnicity, and gender.

102.   On several occasions from in or about February 2022, and continuing until in or about February 2023, Plaintiff refused to participate in Defendant's illegal, discriminatory, retaliatory, immoral, and fraudulent activities, including without limitation, the harassment and intimidation of, retaliation against, and wrongful termination of employees on protected medical leave, and account of employees' protected characteristics such as race, ethnicity, and gender.

103.   In response, Defendant retaliated against Plaintiff, including, but not limited to, unreasonably and unjustifiably criticizing the quality of Plaintiff's work product and general job execution; publicly ridiculing and haranguing her job performance; and terminating Plaintiff's employment (as described in the preceding paragraphs of this Complaint.  (See, supra, at Sect. IV.)

104.   Plaintiff's protected activities, as set forth herein, were individually and collectively a substantial motivating reason in Defendant's decision to terminate Plaintiff's employment.

105.   The actions of Plaintiff's Tesla managers, as identified herein, as well as those of their agents and subordinates, negatively affected the terms, conditions, and privileges of Plaintiff's employment, ultimately resulting in Plaintiff's wrongful and illegal termination.

106.   Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, did not treat non-complaining, non-objecting, non-outspoken, non-Black, non-female-identifying employees in the same manner in which Plaintiff was treated; they were treated more favorably.  Thus, Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, personally singled Plaintiff out for disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and privileges of Plaintiff's employment, ultimately culminating in wrongful termination, because of Plaintiff's protected activities as described herein.

107.   Defendant's reasons for harassing Plaintiff and subsequently terminating Plaintiff's employment are pretextual in nature and calculated to disguise the motivating bases of the adverse employment actions to which Plaintiff was subjected.

108.   As a direct, foreseeable, and proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that Plaintiff has suffered, and will continue to suffer, actual, consequential, and incidental financial losses, including, without limitation, loss of income, salary and benefits, and the intangible loss of employment-related opportunities for growth in Plaintiff's field and damage to Plaintiff's professional reputation, humiliation, embarrassment, mental and emotional distress and discomfort all in an amount according to proof at the time of trial.

109.   Plaintiff is informed and believes, and on that basis alleges, that the aforesaid acts directed toward Plaintiff by Defendants were carried out with a conscious disregard of Plaintiff's right to be free from such illegal behavior, such as to constitute oppression, fraud, or malice pursuant to section 3294 of the California Civil Code, among other provisions, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendants.

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL

110.   The actions alleged herein were taken by managing agents and/or officers of Defendant and/or ratified by managing agents and/or officers of Defendant, namely, Burgers and Somsin.  In so doing, said managing agents and/or officers of Defendant acted with oppression and malice as those terms are used in section 3294 of the California Civil Code.  As such, Plaintiff is entitled to an award of punitive damages.

111.   Plaintiff is also entitled to an award of attorneys' and experts' fees pursuant to, inter alia, section 1102.5(f) of the California Labor Code.

## Third Cause of Action
### Discrimination
### In Violation of Cal. Gov. Code § 12940(a),(h)
### (Against All Defendants)

112.   Plaintiff incorporates by reference paragraphs 1 through 111, above, and repeats, reiterates, and realleges each and every allegation contained therein with the same force and effect as if such paragraphs were set forth fully at length here.

113.   Section 12940(a) of the California Government Code makes it unlawful for an employer "to discriminate against [a] person in compensation or in terms, conditions, or privileges of employment" because of their race or color, among other protected characteristics."

114.   As described in the preceding paragraphs of this Complaint, on multiple occasions, from in or about February 2022, and continuing until in or about February 2023, Plaintiff engaged in such protected conduct under FEHA by complaining to and about Defendant's conduct.  In particular, Plaintiff's protected activity included, but is not limited to that which was described in the preceding paragraphs of this Complaint (see, supra, at Sect. IV):  voicing concerns, objections, and complaints about the harassment and intimidation of employees on

protected medical leave, namely, but not limited to, Bianca Maradiaga; voicing concerns, objections, and complaints about the wrongful termination of employees on protected medical leave, namely, but not limited to, Bianca Maradiaga; voicing concerns, objections, and complaints about the harassment and intimidation of employees because of their race and ethnicity; and, voicing concerns, objections, and complaints about the harassment and intimidation of employees because of their gender.

115.   At all times material to the allegations of this Complaint in which Plaintiff engaged in such protected activities, Plaintiff maintained a good faith and reasonable belief that it was a violation of state and federal law for Defendant to engage in the conduct about which she voiced concerns, objections, and complaints.  In particular, Plaintiff maintained a good faith and reasonable belief that Defendant's conduct violated the provisions of the FMLA, California's FEHA, and other statutory laws protective of employees on medical leave, and prohibitive of harassment, discrimination, and retaliation based upon employees' protected characteristics such as race, ethnicity, and gender.

116.   On several occasions from in or about February 2022, and continuing until in or about February 2023, Plaintiff refused to participate in Defendant's illegal, discriminatory, retaliatory, immoral, and fraudulent activities, including without limitation, the harassment and intimidation of, retaliation against, and wrongful termination of employees on protected medical leave, and account of employees' protected characteristics such as race, ethnicity, and gender.

117.   In response, Defendant retaliated against Plaintiff, including, but not limited to, unreasonably and unjustifiably criticizing the quality of Plaintiff's work product and general job execution; publicly ridiculing and haranguing her job performance; and terminating Plaintiff's employment (as described in the preceding paragraphs of this Complaint.  (See, supra, at Sect. IV.)

118.   Plaintiff's protected activities, as set forth herein, were individually and collectively a substantial motivating reason in Defendant's decision to terminate Plaintiff's employment.

119.   Furthermore, as averred in the preceding paragraphs of this Complaint, Plaintiff is a Black woman.  Yet, on multiple occasions, from in or about February 2022, and continuing until in or about February 2023, Draper's managers, Burgers and Somsin, singled Draper out for disparate treatment with regard to the terms, conditions, and privileges of her employment because of Draper's race, ethnicity, and color.  In particular, as described above, these managers' disparate treatment of Draper included, but was not limited to:  calling and referring to Plaintiff as an "Angry Black Woman"; calling and referring to Plaintiff as "aggressive," a racial stereotype and trope meant to degrade Black persons, particularly Black women; calling and referring to Plaintiff as "out of control," a racial stereotype and trope meant to degrade Black persons, particularly Black women; accusing Plaintiff of "playing the race card," a racial stereotype and trope meant to dismiss and rationalize Black persons' legitimate experiences of racism and race-based bias; unreasonably and unjustifiably criticizing the quality of Plaintiff's work product and general job execution; publicly ridiculing and haranguing her job performance; and terminating Plaintiff's employment (as described in the preceding paragraphs of this Complaint.  (See, supra, at Sect. IV.)

120.   The actions of Plaintiff's Tesla managers, as identified herein, as well as those of their agents and subordinates, negatively affected the terms, conditions, and privileges of Plaintiff's employment, ultimately resulting in Plaintiff's wrongful and illegal termination.

121.   Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, did not treat non-complaining, non-objecting, non-outspoken, non-Black, non-female-identifying employees in the same manner in which Plaintiff was treated; they were treated more favorably.  Thus, Plaintiff's Tesla

managers, as identified herein, as well as their agents and subordinates, personally singled Plaintiff out for disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and privileges of Plaintiff's employment, ultimately culminating in wrongful termination, because of Plaintiff's protected characteristics and activities as described herein.

122.   Defendant's reasons for harassing Plaintiff and subsequently terminating Plaintiff's employment are pretextual in nature and calculated to disguise the motivating bases of the adverse employment actions to which Plaintiff was subjected.

123.   As a direct, foreseeable, and proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that Plaintiff has suffered, and will continue to suffer, actual, consequential, and incidental financial losses, including, without limitation, loss of income, salary and benefits, and the intangible loss of employment-related opportunities for growth in Plaintiff's field and damage to Plaintiff's professional reputation, humiliation, embarrassment, mental and emotional distress and discomfort all in an amount according to proof at the time of trial.

124.   Plaintiff is informed and believes, and on that basis alleges, that the aforesaid acts directed toward Plaintiff by Defendants were carried out with a conscious disregard of Plaintiff's right to be free from such illegal behavior, such as to constitute oppression, fraud, or malice pursuant to section 3294 of the California Civil Code, among other provisions, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendants.

125.   The actions alleged herein were taken by managing agents and/or officers of Defendant and/or ratified by managing agents and/or officers of Defendant, namely, Burgers and Somsin.  In so doing, said managing agents and/or officers of Defendant acted with oppression and malice as those terms are used in

section 3294 of the California Civil Code.  As such, Plaintiff is entitled to an award of punitive damages.

126.   Plaintiff is also entitled to an award of attorneys' and experts' fees pursuant to, inter alia, section 12965(b) of the California Government Code.

**Fourth Cause of Action**

**Wrongful Termination in Violation of Public Policy**

**(Against All Defendants)**

127.   Plaintiff incorporates by reference paragraphs 1 through 126, above, and repeats, reiterates, and realleges each and every allegation contained therein with the same force and effect as if such paragraphs were set forth fully at length here.

128.   The discharge of an employee in retaliation for resisting or complaining about employer violations of laws that secure important public policies contravenes those policies, and gives rise to a common law action in tort.

129.   As described in the preceding paragraphs of this Complaint, on multiple occasions, from in or about February 2022, and continuing until in or about February 2023, Plaintiff engaged in such protected conduct under FEHA and section 1102.5 by complaining to and about Defendant's conduct.  In particular, Plaintiff's protected activity included, but is not limited to that which was described in the preceding paragraphs of this Complaint (see, supra, at Sect. IV): voicing concerns, objections, and complaints about the harassment and intimidation of employees on protected medical leave, namely, but not limited to, Bianca Maradiaga; voicing concerns, objections, and complaints about the wrongful termination of employees on protected medical leave, namely, but not limited to, Bianca Maradiaga; voicing concerns, objections, and complaints about the harassment and intimidation of employees because of their race and ethnicity;

and, voicing concerns, objections, and complaints about the harassment and intimidation of employees because of their gender.

130.   At all times material to the allegations of this Complaint in which Plaintiff engaged in such protected activities, Plaintiff maintained a good faith and reasonable belief that it was a violation of state and federal law for Defendant to engage in the conduct about which she voiced concerns, objections, and complaints.  In particular, Plaintiff maintained a good faith and reasonable belief that Defendant's conduct violated the provisions of the FMLA, California's FEHA, and other statutory laws protective of employees on medical leave, and prohibitive of harassment, discrimination, and retaliation based upon employees' protected characteristics such as race, ethnicity, and gender.

131.   On several occasions from in or about February 2022, and continuing until in or about February 2023, Plaintiff refused to participate in Defendant's illegal, discriminatory, retaliatory, immoral, and fraudulent activities, including without limitation, the harassment and intimidation of, retaliation against, and wrongful termination of employees on protected medical leave, and account of employees' protected characteristics such as race, ethnicity, and gender.

132.   In response, Defendant retaliated against Plaintiff, including, but not limited to, unreasonably and unjustifiably criticizing the quality of Plaintiff's work product and general job execution; publicly ridiculing and haranguing her job performance; and terminating Plaintiff's employment (as described in the preceding paragraphs of this Complaint.  (See, supra, at Sect. IV.)

133.   Plaintiff's protected activities, as set forth herein, were individually and collectively a substantial motivating reason in Defendant's decision to terminate Plaintiff's employment.

134.   The actions of Plaintiff's Tesla managers, as identified herein, as well as those of their agents and subordinates, negatively affected the terms, conditions,

and privileges of Plaintiff's employment, ultimately resulting in Plaintiff's wrongful and illegal termination.

135.    Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, did not treat non-complaining, non-objecting, non-outspoken, non-Black, non-female-identifying employees in the same manner in which Plaintiff was treated; they were treated more favorably.  Thus, Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, personally singled Plaintiff out for disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and privileges of Plaintiff's employment, ultimately culminating in wrongful termination, because of Plaintiff's protected activities as described herein.

136.    Defendant's violation of Plaintiff's statutory and constitutional rights is inconsistent with, and hostile to, the public's interest in correcting violations of state and federal laws and regulations, particularly with respect to protecting the workplace rights of permanently-disabled and temporarily-disabled individuals and ensuring their ability to work and to meaningfully contribute to society and the economy, and has a chilling effect on other disabled individuals who might wish to participate in the workforce.

137.    Defendant's violation of Plaintiff's statutory and constitutional rights is inconsistent with, and hostile to, the public's interest in correcting violations of state and federal laws and regulations, particularly with respect to protecting the workplace rights of racial and ethnic minorities, and of female-identifying individuals, and ensuring their ability to work and to meaningfully contribute to society and the economy, and has a chilling effect on other such minorities and individuals who might wish to participate in the workforce.

138.    Defendant's reasons for harassing Plaintiff and subsequently terminating Plaintiff's employment are pretextual in nature and calculated to

disguise the motivating bases of the adverse employment actions to which Plaintiff was subjected.

139.   As a direct, foreseeable, and proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that Plaintiff has suffered, and will continue to suffer, actual, consequential, and incidental financial losses, including, without limitation, loss of income, salary and benefits, and the intangible loss of employment-related opportunities for growth in Plaintiff's field and damage to Plaintiff's professional reputation, humiliation, embarrassment, mental and emotional distress and discomfort all in an amount according to proof at the time of trial.

140.   Plaintiff is informed and believes, and on that basis alleges, that the aforesaid acts directed toward Plaintiff by Defendants were carried out with a conscious disregard of Plaintiff's right to be free from such illegal behavior, such as to constitute oppression, fraud, or malice pursuant to section 3294 of the California Civil Code, among other provisions, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendants.

141.   The actions alleged herein were taken by managing agents and/or officers of Defendant and/or ratified by managing agents and/or officers of Defendant, namely, Burgers and Somsin.  In so doing, said managing agents and/or officers of Defendant acted with oppression and malice as those terms are used in section 3294 of the California Civil Code.  As such, Plaintiff is entitled to an award of punitive damages.

### Fifth Cause of Action

**Failure to Prevent Unlawful Discrimination**

**In Violation of Cal. Gov. Code § 12940(k)**

**(Against All Defendants)**

142.   Plaintiff incorporates by reference paragraphs 1 through 141, above,

and repeats, reiterates, and realleges each and every allegation contained therein with the same force and effect as if such paragraphs were set forth fully at length here.

143.   Section 12940(k) of the California Government Code makes it unlawful for an employer to "fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."

144.   As described in the preceding paragraphs of this Complaint, on multiple occasions, from in or about February 2022, and continuing until in or about February 2023, Plaintiff engaged in such protected conduct under FEHA by complaining to and about Defendant's conduct.  In particular, Plaintiff's protected activity included, but is not limited to that which was described in the preceding paragraphs of this Complaint (see, supra, at Sect. IV):  voicing concerns, objections, and complaints about the harassment and intimidation of employees on protected medical leave, namely, but not limited to, Bianca Maradiaga; voicing concerns, objections, and complaints about the wrongful termination of employees on protected medical leave, namely, but not limited to, Bianca Maradiaga; voicing concerns, objections, and complaints about the harassment and intimidation of employees because of their race and ethnicity; and, voicing concerns, objections, and complaints about the harassment and intimidation of employees because of their gender.

145.   At all times material to the allegations of this Complaint in which Plaintiff engaged in such protected activities, Plaintiff maintained a good faith and reasonable belief that it was a violation of state and federal law for Defendant to engage in the conduct about which she voiced concerns, objections, and complaints.  In particular, Plaintiff maintained a good faith and reasonable belief that Defendant's conduct violated the provisions of the FMLA, California's FEHA, and other statutory laws protective of employees on medical leave, and prohibitive of harassment, discrimination, and retaliation based upon employees' protected

characteristics such as race, ethnicity, and gender.

146.   On several occasions from in or about February 2022, and continuing until in or about February 2023, Plaintiff refused to participate in Defendant's illegal, discriminatory, retaliatory, immoral, and fraudulent activities, including without limitation, the harassment and intimidation of, retaliation against, and wrongful termination of employees on protected medical leave, and account of employees' protected characteristics such as race, ethnicity, and gender.

147.   In response, Defendant retaliated against Plaintiff, including, but not limited to, unreasonably and unjustifiably criticizing the quality of Plaintiff's work product and general job execution; publicly ridiculing and haranguing her job performance; and terminating Plaintiff's employment (as described in the preceding paragraphs of this Complaint.  (See, supra, at Sect. IV.)

148.   Plaintiff's protected activities, as set forth herein, were individually and collectively a substantial motivating reason in Defendant's decision to terminate Plaintiff's employment.

149.   The actions of Plaintiff's Tesla managers, as identified herein, as well as those of their agents and subordinates, negatively affected the terms, conditions, and privileges of Plaintiff's employment, ultimately resulting in Plaintiff's wrongful and illegal termination.

150.   Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, did not treat non-complaining, non-objecting, non-outspoken, non-Black, non-female-identifying employees in the same manner in which Plaintiff was treated; they were treated more favorably.  Thus, Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, personally singled Plaintiff out for disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and privileges of Plaintiff's employment, ultimately culminating in wrongful termination, because of Plaintiff's protected activities as described herein.

151.   Defendant's reasons for harassing Plaintiff and subsequently terminating Plaintiff's employment are pretextual in nature and calculated to disguise the motivating bases of the adverse employment actions to which Plaintiff was subjected.

152.   Defendant failed to take reasonable steps necessary to prevent the discrimination and retaliation that Plaintiff was subjected to from occurring, namely, by among other things:  failing to educate, inform, and train its employees; failing to have a robust and effective internal reporting process for such violations; and failing to promptly and thoroughly investigate such violations.

153.   As a direct, foreseeable, and proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that Plaintiff has suffered, and will continue to suffer, actual, consequential, and incidental financial losses, including, without limitation, loss of income, salary and benefits, and the intangible loss of employment-related opportunities for growth in Plaintiff's field and damage to Plaintiff's professional reputation, humiliation, embarrassment, mental and emotional distress and discomfort all in an amount according to proof at the time of trial.

154.   Plaintiff is informed and believes, and on that basis alleges, that the aforesaid acts directed toward Plaintiff by Defendants were carried out with a conscious disregard of Plaintiff's right to be free from such illegal behavior, such as to constitute oppression, fraud, or malice pursuant to section 3294 of the California Civil Code, among other provisions, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendants.

155.   The actions alleged herein were taken by managing agents and/or officers of Defendant and/or ratified by managing agents and/or officers of Defendant, namely, Burgers and Somsin.  In so doing, said managing agents and/or officers of Defendant acted with oppression and malice as those terms are used in section 3294 of the California Civil Code.  As such, Plaintiff is entitled to an award

of punitive damages.

156.   Plaintiff is also entitled to an award of attorneys' and experts' fees pursuant to, inter alia, section 12965(b) of the California Government Code.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial to resolve each and every one of the claims averred in this Complaint against each and every Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as to each of the Causes of Action set forth herein, for each such category of damages set forth therein, only to the extent provided by law, according to proof, as follows:

**On the First Cause of Action for Retaliation (Cal. Gov. Code § 12940(a),(h)):**

1.   For actual and money damages in an amount according to proof at trial;

2.   For compensatory and emotional distress damages;

3.   For punitive and exemplary damages (only to the extent provided by law);

4.   For Plaintiff's reasonable attorneys' fees (only to the extent provided by law);

5.   For Plaintiff's reasonable experts' fees (only to the extent provided by law);

6.   For an award of prejudgment interest;

7.   For such other relief as the Court deems just and proper.

**On the Second Cause of Action for Retaliation (Cal. Labor Code § 1102.5(b)):**

1.   For actual and money damages in an amount according to proof at trial;

2.    For compensatory and emotional distress damages;

3.    For punitive and exemplary damages

(only to the extent provided by law);

4.    For Plaintiff's reasonable attorneys' fees

(only to the extent provided by law);

5.    For Plaintiff's reasonable experts' fees

(only to the extent provided by law);

6.    For an award of prejudgment interest;

7.    For such other relief as the Court deems just and proper.

**On the Third Cause of Action for Discrimination (Cal. Gov. Code § 12940(a)):**

1.    For actual and money damages in an amount according to proof at trial;

2.    For compensatory and emotional distress damages;

3.    For punitive and exemplary damages

(only to the extent provided by law);

4.    For Plaintiff's reasonable attorneys' fees

(only to the extent provided by law);

5.    For Plaintiff's reasonable experts' fees

(only to the extent provided by law);

6.    For an award of prejudgment interest;

7.    For such other relief as the Court deems just and proper.

**On the Fourth Cause for Wrongful Termination in Violation of Public Policy:**

1.    For actual and money damages;

2.    For compensatory and emotional distress damages;

3.    For punitive and exemplary damages

(only to the extent provided by law);

4.    For Plaintiff's reasonable attorneys' fees

39

1            (only to the extent provided by law);

2       5.   For Plaintiff's reasonable experts' fees

3            (only to the extent provided by law);

4       6.   For an award of prejudgment interest;

5       7.   For such other relief as the Court deems just and proper.

6

7   **On the Fifth Cause of Action for Failure to Prevent Discrimination and**

8   **Harassment (Cal. Gov. Code § 12940(k)):**

9       1.   For actual and money damages in an amount according to proof at trial;

10      2.   For compensatory and emotional distress damages;

11      3.   For punitive and exemplary damages

12           (only to the extent provided by law);

13      4.   For Plaintiff's reasonable attorneys' fees

14           (only to the extent provided by law);

15      5.   For Plaintiff's reasonable experts' fees

16           (only to the extent provided by law);

17      6.   For an award of prejudgment interest;

18      7.   For such other relief as the Court deems just and proper.

19
     Dated:  May 5, 2023                 CAMERON | JONES LLP
20                                       Indira J. Cameron-Banks

21
                                          /s/ Terrence M. Jones
22
                                         Attorneys for Plaintiff
23                                       KAREN DRAPER

24

25

26

27

28

# Exhibit A



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

**Civil Rights Department**

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 (voice) | 800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

May 5, 2023

Terrence Jones
6737 Bright Avenue, Suite B6
Whittier, California 90601

RE:   **Notice to Complainant's Attorney**
      CRD Matter Number: 202305-20587205
      Right to Sue: Draper / Tesla, Inc.

Dear Terrence Jones:

Attached is a copy of your complaint of discrimination filed with the Civil Rights Department (CRD) pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq. Also attached is a copy of your Notice of Case Closure and Right to Sue.

**Pursuant to Government Code section 12962, CRD will not serve these documents on the employer.** You must serve the complaint separately, to all named respondents. Please refer to the attached Notice of Case Closure and Right to Sue for information regarding filing a private lawsuit in the State of California. A courtesy "Notice of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the CRD does not review or edit the complaint form to ensure that it meets procedural or statutory requirements.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 02/23)



STATE OF CALIFORNIA  |  Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

Civil Rights Department

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 (voice) | 800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

May 5, 2023

RE:   **Notice of Filing of Discrimination Complaint**
      CRD Matter Number: 202305-20587205
      Right to Sue: Draper / Tesla, Inc.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Civil
Rights Department (CRD) in accordance with Government Code section 12960. This
constitutes service of the complaint pursuant to Government Code section 12962. The
complainant has requested an authorization to file a lawsuit. A copy of the Notice of
Case Closure and Right to Sue is enclosed for your records.

Please refer to the attached complaint for a list of all respondent(s) and their
contact information.

No response to CRD is requested or required.

Sincerely,

Civil Rights Department



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 (voice) | 800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

May 5, 2023

Karen Draper
6737 Bright Avenue, Suite B6
Whittier, CA 90601

RE:   **Notice of Case Closure and Right to Sue**
CRD Matter Number: 202305-20587205
Right to Sue: Draper / Tesla, Inc.

Dear Karen Draper:

This letter informs you that the above-referenced complaint filed with the Civil Rights Department (CRD) has been closed effective May 5, 2023 because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 02/23)

**COMPLAINT OF EMPLOYMENT DISCRIMINATION**
**BEFORE THE STATE OF CALIFORNIA**
**Civil Rights Department**
**Under the California Fair Employment and Housing Act**
**(Gov. Code, § 12900 et seq.)**

**In the Matter of the Complaint of**

Karen Draper                                                     CRD No. 202305-20587205

                                   Complainant,

vs.

Tesla, Inc.
1 Tesla Road
Austin, TX 78725

                                   Respondents

---

**1**. Respondent **Tesla, Inc.** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2**. Complainant **Karen Draper**, resides in the City of **Whittier,** State of **CA.**

**3**. Complainant alleges that on or about **February 10, 2023**, respondent took the following adverse actions:

**Complainant was harassed** because of complainant's color, sex/gender, gender identity or expression, age (40 and over), other, race (includes hairstyle and hair texture).

**Complainant was discriminated against** because of complainant's color, sex/gender, gender identity or expression, age (40 and over), other, race (includes hairstyle and hair texture) and as a result of the discrimination was terminated, denied hire or promotion, reprimanded, other, denied work opportunities or assignments.

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment, participated as a witness in a discrimination or harassment complaint and as a result was terminated, denied hire or promotion, reprimanded, other, denied work opportunities or assignments.

Date Filed: May 5, 2023

CRD-ENF 80 RS (Revised 12/22)

1
2
3
4
5
6
7
8
9

**Additional Complaint Details:** Complainant Karen Draper ("Draper") was subjected to unlawful harassment, discrimination, and retaliation in violation of the Fair Employment and Housing Act (FEHA) on account of her: race (Black American); complaints of discriminatory conduct by other employees; and complaints of potential violations of local, state, and federal law.  Complainant was employed by Tesla, Inc., a Delaware corporation doing business in California as "Tesla Motors, Inc." (hereinafter, "Tesla," "Defendant," or the "Company").  Draper worked as a Human Resources ("HR") manager for the auto production unit of Tesla at its facility in Fremont, California.  She began working for Tesla on or about February 28, 2022, and was abruptly terminated on or about February 10, 2023.  The proffered basis for Draper's termination was pretextual.  The decision to fire Draper, as validated by Tesla's executive staff and managing agents was not truly the result of intentionally-nondescript "performance issues," but was instead rooted in retaliatory and race-based animus as a direct consequence of Draper's refusal to engage in what she reasonably believed in good faith to be an illegal act on Tesla's behalf—that is, to execute the termination of another employee, without just cause, while such employee was on protected medical leave.

10
11
12
13
14
15
16
17
18
19
20
21
22

Among other reasons, Tesla wrongfully terminated Draper's employment as illegal reprisal for:  voicing concerns, objections, and complaints about the harassment and intimidation of employees on protected medical leave, namely, but not limited to, Bianca Maradiaga; voicing concerns, objections, and complaints about the wrongful termination of employees on protected medical leave, namely, but not limited to, Bianca Maradiaga; voicing concerns, objections, and complaints about the harassment and intimidation of employees because of their race and ethnicity; and, voicing concerns, objections, and complaints about the harassment and intimidation of employees because of their gender.

      As well, Draper was subjected to disparate treatment because of her race, ethnicity, and color, including, but not limited to:  being called and referred to as an "Angry Black Woman"; calling and referring to Plaintiff as "aggressive," a racial stereotype and trope meant to degrade Black persons, particularly Black women; being called and referred to as "out of control," a racial stereotype and trope meant to degrade Black persons, particularly Black women; being accused of "playing the race card," a racial stereotype and trope meant to dismiss and rationalize Black persons' legitimate experiences of racism and race-based bias; having the quality of her work product and general job execution unreasonably and unjustifiably criticized; having her job performance publicly ridiculed and harangued; and having her employment terminated.

Draper's Tesla managers did not treat non-complaining, non-objecting, non-outspoken, non-Black, non-female-identifying employees in the same manner in which Draper was treated; they were treated more favorably.  Thus, Draper's Tesla managers personally singled Draper out for disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and privileges of Draper's employment, ultimately culminating in wrongful termination, because of Draper's protected characteristics and activities.

23
24
25
26
27
28

Date Filed: May 5, 2023

1   VERIFICATION

2   I, **Terrence Jones**, am the **Attorney** in the above-entitled complaint.  I have read the
3   foregoing complaint and know the contents thereof.  The matters alleged are based
    on information and belief, which I believe to be true.

4   On May 5, 2023, I declare under penalty of perjury under the laws of the State of
5   California that the foregoing is true and correct.

6                                                                    **Whittier, CA**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                                              -3-
                              *Complaint – CRD No. 202305-20587205*
27
    Date Filed: May 5, 2023
28
                                                         CRD-ENF 80 RS (Revised 12/22)

# Exhibit B



**From:** Karen Draper <kadraper@tesla.com>
**Date:** Thursday, June 9, 2022 at 11:13 PM
**To:** Elon Musk ███████████████
**Cc:** Hrushikesh Sagar ███████████████, Aenoi Jones ███████████████
**Subject:** HR Fremont Team (Skip-Level) Meeting 6/8/22 Follow Up

Hello Mr. Musk,
        As discussed, please find below the notes from the 6/8/22 on-site meeting with HR Fremont, CA. Please review and reply as appropriate. Thank you.

**2/22/22 – Previous Meeting Task Updates**
1. Parking Lot – additional light installation
2. Security Team Enhancements
3. Additional Surveillance/Camera System Upgrades
4. On-site LOA and Payroll Personnel

**Meeting Minutes**
In alignment with Elon's expectations - all Business and HR Leaders will be physically present at the locations they lead/support:
Effective Immediately – **Aenoi Jones**, will assume the role of Site HR Leader (HR Director) @ Fremont, CA
                (as previously assigned by Elon on 2/22/22)
Effective Immediately -HR for HR role/responsibilities will be reassigned from:
        **Allie Arebalo @ Giga, TX > Karen Draper @ Fremont, CA**.

1. **Staffing/Hiring Challenges Plan to Action @ Fremont, CA**
Local HR Leader will leverage current internal talent to fill critical/difficult-to-fill roles.
Effective Immediately:
**Angela Roundtree, Sr. HRBP > HR Manager @ Fremont, CA**
**Keiahnna Poole, Sr. HRBP > HR Manager @ Fremont, CA**

2. **Staff Retention of Top Talent Plan**

1

Effective Immediately – local HR will evaluate and deliver 'appreciation bonus award' for current HR teams **by end of Q2.**

Local HR Leader will develop and implement Career Path/Training Module for HRC role @ Fremont.  Ex. **(S1>S2>S3>S4>Lead(I-IV)>Supervisors>AM>Manager)**

Local HR will evaluate HR Production Team premium/differential (workload vs. other HR teams).

### 3. Market Adjustments/Competitive Pay Alignment – Bay Area, CA

Local HR Leader will lead and implement local **HR Market Compensation Analysis** to establish new pay scale and appropriate increases for HR roles **by end of Q2.**

### 4. Relocation Costs & Expenses (to attract/hire and retain top candidates)

Local HR Leader will partner with Finance Leadership to evaluate and align to the location COL (Cost of Living) @ Fremont, CA.

### 5. Systems Access

Local HR Leader will partner with appropriate business partners to establish access/training to HRP's – for all HRIS systems – including IST/ER/LOA/Payroll/ADA/KRONOS/. Goal is to mitigate redundancy in tasks and reduce timeline for open employee relations issues.

Local HR will Partner with the appropriate leadership to recruit/hire on-site Stock Admin associate(s).

### 6. Budget

-Local HR Leader will partner with appropriate business leader to establish a budget for HR related projects:
1. Team Building Events/Outings
2. Celebrations
3. Team Gear (Swag)
4. Rewards/Recognition/Bonuses/Awards

### 7. Other Items

HR will receive 2 electric/battery powered vehicles **(golf carts)** for ease of access to service client groups.


Local Point of Contact:  Hrushikesh "Hrushi" Sagar
Items to escalate to Elon:  Anything that Hrushi cannot resolve
Elon's Email:██████████ (Best after midnight)

---

**Confirmation of action items approved by Elon:**
Hrushi can approve Immigration and Relocation Exceptions
Hrushi can approve comp adjustments up to $500k (prev. limit $100k)
Hrushi can authorize internal moves/promotions (outside of IM criteria) for Critical Roles.

Increased Salary Range for roles (new/existing)
1. P2 – up to $96k - $128k
2. P3 – up to $129 - $157k

HR for HR will be local and on-site @ Fremont, CA under Karen Draper (reporting to Hrushi)
The following people-support team members will report under Fremont HR for HR
1. Compensation Support partner Jorge Kornblueh
2. Recruiting Team Support partner Lily Crowley
3. (2) ER support partners (TBD)

4. All Fremont direct-support, people relations teams reporting to leaders in other locations i.e., Training/Onboarding/ADA etc.


**I Appreciate You!**

**Karen Draper** | **Sr. HR Business Partner** | Production HR

45500 Fremont Blvd | Fremont, CA 94538

E. kadraper@tesla.com



**From:** Karen Draper <kadraper@tesla.com>
**Date:** Friday, August 19, 2022 at 12:55 PM
**To:** Karen Draper ███████████████
**Subject:** FW: Fremont HR Team

## I Appreciate You!

**Karen Draper** | **Sr. HR Business Partner** | Production HR

45500 Fremont Blvd | Fremont, CA 94538

E. <u>kadraper@tesla.com</u>





**From:** Karen Draper
**Sent:** Thursday, July 21, 2022 11:14 PM
**To:** Elon Musk ████████████████

**Cc:** Aenoi Jones ███████████████ ; Hrushikesh Sagar ███████████
**Subject:** Fremont HR Team

Hello,
I am writing you tonight to provide an update on the status of our HR Team. Since your last visit, we have seen some slight improvements such as leveraging our internal talent in HR by offering internal promotions and the official appointment of Aenoi Jones as the Site HR Leader. However, there are some important items that remain unfulfilled. Specifically, you were very clear and deliberate that any Leader with direct reports at Fremont, should be physically present at Fremont, yet that continues not to be true. We specifically discussed the lack of support from our external partners and teams; particularly, the lack of HR4HR on-site. You stated that you wanted that service to be visible and accessible to our team - and you appointed me as the person to lead that initiative. However, since you gave that directive, the leadership team from Giga-Texas/Nevada (Omead/Bert and Allie) have launched a campaign to undermine your authority and have actively worked against empowering Hrushi and Aenoi to lead our site. This was the same undermining that occurred when they hired 2 new Sr. HR Managers over Aenoi - after you appointed her the Site Leader in February. Honestly, I feel that they are intimidated by Fremont and fear that when we assume control of our teams and our site - their incompetence will be exposed. Aenoi and Hrushi have been working together trying to establish their positions and secure support services such as HR4HR at our site - as they understand the critical natural is not having this support system. But they continue to be met with opposition from Texas/Nevada leadership. The Fremont Production HR team works tirelessly, day and night supporting the mission of the business, but we cannot even get the basic support of an HR4HR partner. There are no services to support us - physically, mentally, emotionally. We are all deeply committed to Tesla...that's why we are here. Yet, we are dismissed and met with opposition and ignorance from Texas/Nevada leadership. The current HR4HR regime has been absent, unresponsive, and dismissive. I can confidently say that you could count on one hand how many people on our team have ever met Allie or received support from her. For those who have attempted to seek her support, they have been met with silence, incompetence, and ignorance. **There is not one success story of a positive outcome from the current HR4HR Texas team.**
Fremont is your Flagship Site. It houses the largest HR team and the largest overall employee population, yet we find ourselves shut out, ignored, and begging for services. Fremont just produced your 2 Millionth vehicle - largely on the backs of a forgotten HR team. Without the leadership and commitment of members of this HR team and our partners (recruiting/training/compensation) we could not have successfully met this goal. We bring the people in the doors, and we work hard to keep them here. HR provides this business with the invaluable service of retaining the talent needed to run this business. We were a very lean team, yet we powered through, servicing client groups of up to 2500:1. We are constantly acting as agents of this business, mitigating lawsuits, and driving employee engagement - but it feels thankless. Fremont deserves better than this. We have the internal talent and experience to lead our site and set the example for all your other locations. We should not be regulated to scraps and denigrated to begging Texas/Nevada to support us. This week, a newly hired HR4HR person from Texas - Leah Allen - who is supposedly here to support us- we've seen once. She is inexperienced and unable to provide the support that this team needs and deserves. Having HR4HR Fremont, sitting in Texas - or anywhere else is useless. Having HR4HR permanently on-site at Fremont is critical to sustaining this team. We have the internal talent - you said it yourself. The act of bringing another Texas/Nevada person to lead Fremont is a slap in our face and a direct undermining of your authority. Empower us, empower Hrushi, empower Aenoi...you have the right team at Fremont - now, trust us to show you that we can be the true Tesla leaders. Thank you.


I Appreciate You!
Karen Draper
Sr. HR Business Partner-Production
Tesla

# Exhibit C



**From:** Karen Draper ███████████████

**Date:** Saturday, February 11, 2023 at 12:04 AM

**To:** ████████████████████████

**Subject:** Today was my last day at Tesla…THANK YOU!!!

Hello Elon,

        I'm writing you this email to say THANK YOU! Thank you for the opportunity to be a part of your vision for Tesla at the Fremont, CA plant. I joined Tesla just 1 year ago, with great excitement about the future of the mission and the prospect of making a value-added impact on the culture and employee experience. I believe in the mission of Tesla and I respect your unwavering commitment to it. I am proud to have been a part of it!        When I initially joined Tesla, I started with the Model-Y/GA4 Production team as a Sr.HRBP and then an Assoc., HR Manager for the same team. I was committed to this team and from the onset I had a goal to transform the negative narrative around a very fractured relationship between GA4 and HR; while simultaneously fostering an environment where all employees felt valued, heard, seen and respected. I'd like to think that I had some great successes on both points, and made a significant impact on the overall employee experience - based on the positive feedback from many GA4 leaders, employees, and our extended business partners. I am proud of that! Unfortunately, I quickly learned that not all 'leaders' at Tesla are aligned with these ideals, and would rather maintain the status quo, to protect their own agendas. As a result, tonight my employment was ended under the guise of 'Failure to Meet Performance Expectations' - which I find ironic since my previous PA score (after only 3 months) was a strong 3.5, then I was promoted after only 6 months, and I have **never** received any feedback, corrective action or performance related conversation which would indicate that I was underperforming.

This feels a lot like targeting and retaliation for escalating concerns about the lack of integrity, lack of accountability, lack of leadership and for calling out the grossly corrupt and manipulative behaviors of current leaders. I'm certain that my refusal to align with illegal practices related to the treatment of employees, my consistent practice of holding leadership accountable for misconduct, and my vocal disagreement with dangerous and risky business decisions , are the true reasoning for my separation. I would challenge you to find any quantifiable evidence, facts or examples that substantiate the claim of underperformance. In fact, you will more easily find evidence that I am consistently a Top Performer. I will acknowledge that you may find some bruised egos and hurt feelings along the way - because some people can't handle the truth about themselves and their ineptitude, but absolutely nothing that could be considered 'underperforming'. Nonetheless, I'm grateful…grateful for the opportunity to have been the type of TRUE LEADER that your employees deserve. I am the type of leader that always leads with integrity and honesty, who supports, trusts, empowers, develops and builds-up. I have successfully nurtured an amazing team of young HR Professionals who worked with me during my time at Tesla, and who I am confident will continue grow and care about the people at Tesla - because I cared about

them! My hope is that I have prepared them, fortified and strengthened them enough to withstand the destructive environment that I left them in, and that they will have the courage and discernment to know when to walk away from it. They are the legacy I leave behind. Just ask them…they will be honest.

I Appreciate You!
~Karen Pinks-Draper
Sent from my iPhone

| | |
|---|---|
| **From:** | Jessica Jones |
| **Sent:** | Friday, December 9, 2022 4:03 PM |
| **To:** | Karen Draper |
| **Subject:** | Re Bianca Maradiaga |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hi Karen,

I attended my fist GA4 HR sync with Aman Singh on Tuesday, November 15, 2022. Kristopher Lindsey asked for an update on Bianca Madrigal's termination. Aman said everything with Bianca was in process being handled by HR. Kristopher's body language changed and he was curt with Aman. Aman said everything was going through legal and that she would follow once an update was available. This answer did not seem to satisfy Kristopher.

I held my first HR sync on Tuesday, November 22, 2022, at approximately 8:00 PM. As the meeting began, Kristopher asked about Bianca. I stated that Bianca has leveraged her entitled leaves, and the case is with Aman. I said I cannot terminate, and we must respect an employee's entitled leaves. Kristopher expressed that Bianca's continued employment was hurting morale and making the business feel unsupported. Kristopher expressed disappointment at what Bianca was getting away with, and then we moved on to other topics.

I received an email from Kristopher on November 28, 2022, that mentioned I said I would terminate Bianca. I did not respond because this was untrue, and I was not handling Bianca's case.

I held my second HR sync on Tuesday, November 29, 2022. Prior to my HR sync, I asked Karen and Aman about Bianca. During my sync, Kristopher asked why Bianca was not terminated. I explained Bianca's case, and any prior to my first sync, where with Aman. This seemed to upset Kristopher as he stated Aman did not care. Kristopher said Aman guaranteed Bianca would be terminated as soon as she got the greenlight from legal. Kristopher made another comment about Aman never responding and messing up the entire situation. I attempted to redirect the conversation away, and reminded the team that employees are allowed to request entitled leaves. At this point, Kristopher raised his voice and said that was unacceptable. That Karen and Aman ignored this situation, and his department was paying the price. I reminded Kris that Bianca leveraged her entitled leaves, and he asked what exactly I meant by that. I asked him to clarify his question, and he said asked if Bianca is entitled to come back to a job at the same level. I responded by saying the employees on leave have specific protections and that HR was following all guidelines. At that point, Kristopher declared that Karen and Aman messed up this situation and Bianca should have been fired between her leaves. I stated that I did not have the timeline, so I was unsure what that looked. I said that I cannot guarantee that Aman did everything exactly as I would have done, but I assured them that she was diligent and responsive. Kristopher then stated that Bianca was not welcome back. This statement was concerning, and I asked Kristopher what he meant. Kristopher said Bianca is not welcome in GA4. She is not welcome anywhere in GA4. We do not want her here. Aman and Karen dropped the ball, and Bianca should be fired. Kristopher stated it will hurt morale if Bianca is allowed to just return. I said these comments were concerning and that I felt like this needed to be addressed. Kristopher agreed that HR needed to address our mistakes. I told Kristopher that I would arrange a meeting with him, Aman, and Karen. He seemed very satisfied with this answer.

On Wednesday, November 29, 2022, I asked Aman if I misunderstood anything about Bianca's situation. I told Aman that I was concerned about the comments from the previous night. Aman reassured me that HR did respond to concerns as they arose. Later in the day I let Karen know about the events the night before. I told Karen that Kristopher seemed to be taking the situation personally and I was now uncomfortable. I said that this was my third HR sync and Bianca was the

only topic or concern Kristopher expressed or discussed. Karen took immediate action and arranged a meeting with Kristopher.

On Monday December 6, 2022, I met with Kristopher regarding a separate issue. Kristopher mentioned that he had a meeting with Karen regarding Bianca. He asked if I knew what the meeting was about, and I said no. I reminded him that I was not handling Bianca's case and we immediately changed topics and have not discussed Bianca since.

Thank you!

Kind regards,
**Jessica Jones (She/Her/They/Them)**
HR Business Partner
45500 Fremont Blvd, Fremont, CA 94538
E ███████████████



Sophia Favela, Model Y Associate HRBP

About Kristopher Lindsey and his involvement with Bianca Maradiaga's Leave of Absence case, I was made aware of there being some frustration from Kristopher from Aman Singh before 11/29/2022. I don't remember the exact date, but when Jessica Jones joined the team, this case was brought up as one that had a manager consistently wanting updates, but that Aman was trying to close out for Jessica to lighten her case load as she is still new to the Model Y team. Also, Maradiaga was on my list of Model Y employees (GA4, Body, North Paint) that were on Leave and were Active on IST, she was on my radar but her applying for a new leave and that leave getting denied made me hold off on sending her the communications I sent to employees with outstanding LOA return to work because ADA would most likely be engaged.

On November 29th, 2022, I attended a team sync with the leadership of GA4 C Shift around 8:33PM in the Campfire conference room – time stamp comes from the editing history of intakes notes I was cleaning up once I was sat down. Jessica was updating some supervisors and AMs on certain cases, some being attendance related, other being WC investigations, a few were LOA. Not everyone spoke up. I would open the Leaves and Disability portal for the LOA cases. When it was Kristopher's turn, he only had one case he wanted an update about, Bianca Maradiaga's case. While other leaders had more than one, he only asked about this one however there are several other individuals from his shift who are on leave.

Regardless, since it was a LOA case, I pulled up her Leaves and Disability portal while Jessica told Kristopher that there were no updates and that it was being worked on. I can't remember verbatim if that was her phrasing, I was focused on her Leaves portal and concluding that since it was a denied FMLA leave, ADA would have to be engaged. What drew me back into the conversation was Kristopher's reaction to the lack of updates. He made it a point to state how her leave was denied so her absences weren't excused. He made a comment about Bianca Maradiaga essentially not being welcomed at GA4. I can't recall the exact phrasing, this was towards the point of the sync where the other leaders were leaving, though several of the Production supervisors and leads remained, that was around 9:49pm.

After the sync, Jessica informed me on Kristopher's history of persistence when it came to this case. There has been communication with Kristopher about Bianca's leave, but he continued to ask about it.

The next time I witnessed Kristopher interact with Bianca Maradiaga's case was 12/6/2022 during a stand down for Kristopher regarding his behavior around this case. Karen Draper, the Associate HR Manager for Model Y was the one leading this meeting, AnJane Claytor, the HRBP for GA4 D shift, and myself shadowed.

Karen started the meeting and spoke about the case and the concerns Kristopher's behavior had brought up. Kristopher's demeanor changed as the chat continued. He became more abrasive, his volume increased to a noticeable extent, not enough to be yelling, but enough to be noteworthy especially as he grew visibly upset when Karen said that he was "Obsessed" with Bianca Maradiaga's case.

Kristopher stated that it was his understanding that Jessica, during the 11/29/2022 sync she had stated that Bianca's termination would be processed soon. Napoleon Reyes who had joined this meeting was asked to corroborate on this statement by Kristopher since Napoleon was there during the sync. He also

questioned if there was anyone from Tesla Admin, whether that be LOA, HR, anyone was purposefully helping or coaching Bianca on how to continue to take advantage of the system. Karen stated no.

He admitted to being a passionate individual and that he was not obsessed but frustrated with the situation. When asked to elaborate he stated that Bianca Maradiaga's actions had hurt his team, specifically her direct reports. That before her leave, she had production associates working on several different things (I assume he meant they were being trained in several processes/stations) and that she just left them high and dry. At this point his neck was visibly red and he spoke. He seemed to have taken Bianca's leave and lack of return personally. When asked to state how he and his steam could be supported, he stated that other supervisors had flexed up to make up for Bianca's absence.

He stated that before she had gone on leave, "She was already on her way out." Bianca had only been in her role for a few months and had failed to escalate multiple times when the line went down for more than 5 minutes. However, there is no documentation of any kind on IST. When asked why there wasn't anything on her IST, Kristopher stated that Karen had approved a write up. Karen asked to see it, he paused and searched his inbox, then he quickly spun his laptop to show her. Karen asked for where her approval was, after which he stated it was Keiahnna who approved the write up but it was never documented on Inside Tesla. It would not be grounds for termination.

There seemed to be misunderstanding as for how the leave of absence process worked. It was Kristopher's understanding that once a leave was denied, since the dates marked by the leave were no longer covered, they were seen as unexcused absences and were subject to the attendance policy up to and including termination. I explained to him that whether or not the FMLA was approved or not, until the employee is returned on Inside Tesla and are back working, they are not subject to the attendance policy. Karen continued to reiterate Tesla policy was not a federally protected leave.

All that was owed to Bianca was a similar position and same pay, according to Kristopher. He claimed how he no longer wanted her to work at GA4.

During this meeting, Kristopher stated that Karen was upset since she was raising her voice, Karen made it clear she was not upset by this meeting. That it was her responsibility as an agent of this business to protect managers like Kristopher from causing us a lawsuit since behavior like the one he has been exhibiting could lead to legal trouble. He seemed dismissive about the seriousness and HR's intent for this meeting, he was agitated. He expressed his frustration with administration, stating that he felt like he had not gotten much support from HR. He expressed his frustration with the LOA process. After the meeting he stormed off out of the conference room and building inside GA4.